719 S.E.2d 785

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Arnold Wayne McCARTNEY, Defendant Below, Petitioner.**

No. 101457.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 27, 2011.

Decided Nov. 17, 2011.

---

320

Dennis J. Willett, Esq., Steven B. Nanners, Esq., Nanners & Willett, L.C., Buckhannon, WV, for Petitioner.

Darrell V. McGraw, Jr., Esq., Attorney General, Thomas W. Rodd, Esq., Assistant Attorney General, Charleston, WV, for Respondent.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Lewis

County entered on May 10, 2010. In that order, Arnold Wayne McCartney (hereinafter "the petitioner") was sentenced to life imprisonment without mercy for his conviction of first degree murder, following a jury trial that began on February 16, 2010. In this appeal, he asserts that the circuit court erred by: 1) failing to conduct his trial within one term of court; 2) ruling that a statement taken by the investigating officer was admissible; 3) improperly admitting the murder weapon into evidence at trial despite the State's failure to establish a chain of custody; 4) admitting certain testimonial evidence relating to the victim's cause of death; 5) not affording the petitioner the opportunity to present a closing argument during the "mercy" phase of the trial; 6) including an improper jury instruction; and 7) failing to address improper prosecutorial statements during the closing arguments. The petitioner further argues that the cumulative effects of these errors warrants reversal of his conviction. He also asserts that his conviction should be reversed because the indictment was fatally defective. Finally, the petitioner argues that the evidence was insufficient to support his conviction. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, this Court is of the opinion that the circuit court did not commit reversible error and, accordingly, affirms the decision below.

## I.

## FACTS

On December 20, 2008, the petitioner was arrested at his home in Lewis County, West Virginia, for shooting his fiancée, Vickie Paige (hereinafter, the "victim"), in the head at point blank range with a Wesson Firearms Model 41 revolver. The victim was killed instantly. At the time of the shooting, the couple's four-month-old-son was in another room of the home.

Brian Joseph, a friend of the petitioner who had been staying with the petitioner and victim, was not present when the shooting occurred. Mr. Joseph, however, was at the home approximately thirty minutes prior to the victim's murder. At trial, Mr. Joseph explained that he was sitting in the living room and heard several "thumping" noises that sounded like a heavy object hitting the floor and wall of the bedroom where the petitioner and the victim were located. Believing that the petitioner was being physically abusive to the victim, Mr. Joseph looked in the bedroom and noticed the victim on the floor. Mr. Joseph then confronted the petitioner about what he was doing and said, "Arnie, please don't." According to Mr. Joseph, the petitioner became angry. He explained that

> it was like a switch went off, he throwed his beer at me and I turned around and went back through the kitchen and he picked up a stack of dishes to throw at me. They hit the sink and I didn't stop, I just— I went right on around the playpen and jumped out the front door, which there ain't no steps there, so—and I didn't stop, I just went down to the neighbor's house.

Approximately thirty minutes after Mr. Joseph left the trailer, the petitioner, with blood on his hands and shoes, walked to a neighbor's trailer and stated, "I just shot my Vickie." The neighbor provided a statement to the police detailing the petitioner's actions. He indicated that the petitioner was calm and was drinking beer from a can that was covered in blood.

The police were called to the scene and the petitioner was arrested for murder. The petitioner was read his *Miranda* rights [1] and he then gave a lengthy recorded statement to

---

**1.** In *Miranda v. Arizona*, 384 U.S. 436, 444–445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966), the United States Supreme Court set forth the requirements for interrogating a suspect as follows:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either

retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

the chief investigating officer. During the statement, the petitioner admitted that he shot and killed the victim, but claimed that the shooting was an accident. The petitioner stipulated to the admissibility of this statement at his trial. The petitioner also provided a handwritten statement at that time. In the statement, he explained that:

. Me and Vichy [sic] got into it about my truck being broke down.... We started arguing and fighting.... The baby was sitting in the blue chair in front of the stove. She (Vichy) [sic] was in the bedroom sitting on the bed. I went to get the pistol which was in the gun cabinet. The cabinet is in the front room. The pistol is a 41 Magnum. I don't know how many rounds were in the pistol. I usually keep some rounds in it. Then I went to the bedroom. She set down on the bed and we were still arguing. I was standing in front of her. I pointed the gun at her. I didn't think it would go off. I accidentally pulled the trigger.

After providing that statement, and while the petitioner was being transported to the regional jail, he made additional comments to the transporting State Trooper warning him to "never let your friends move in with you," and "I think she was fu* *ing him," referring to the victim and Mr. Joseph.

The day after the petitioner was arrested, the chief investigating officer interviewed him a second time at the regional jail, prior to his previously scheduled arraignment before a magistrate. The petitioner was again given the *Miranda* warnings and he provided the officer with a lengthy digital recording which was condensed to a handwritten summary. Consistent with his written statement provided the prior evening, the petitioner maintained that he only intended to scare the victim and that he accidentally pulled the trigger and shot her in the head. The petitioner said that prior to the shooting, he thought the victim might be "cheating" on him with Mr. Joseph because she "used to ... want a whole lot to do with me when we went to bed and stuff and here lately, she just-she just acted like she didn't want that much to do with me." He also explained that "[i]t did kind of aggravate me a little bit

when [Mr. Joseph] came in there and asked me if everything was all right." The petitioner then stated that he and the victim

got into it ... got to arguing back and forth a little bit ... we got to arguing and fighting and I went in there and got my damn pistol ... just to scare her ... and then she sat down on the bed and she kept arguing and I said, 'Well, I don't want to hear it.' We, you know, kept arguing. And I just pointed it at her, you know, and didn't think it was going to go off and I accidentally pulled the trigger.

The petitioner acknowledged that he ordinarily kept the gun loaded. He further said that he "blacked out" for a short period of time after the shooting. He also asked the investigating officer, "what do you think I am going to get out of this.... Do you think they'll cut me any slack at all?"

On December 22, 2008, counsel was appointed to the petitioner. On January 26, 2009, he was appointed co-counsel. Soon thereafter, the prosecuting attorney provided the petitioner's counsel with the petitioner's statements to the investigating officers, statements of other witnesses who were at the scene of the crime on the night of the murder, and photographs of the crime scene. On January 29, 2009, a preliminary hearing was held in which the Magistrate Court of Lewis County found probable cause and bound the matter over for the grand jury. On March 2, 2009, a Lewis County Grand Jury returned a single count indictment alleging the petitioner had committed murder in the first degree. On March 10, 2009, counsel for the petitioner filed a written motion requesting discovery from the State.

On September 2, 2009, the circuit court conducted a suppression hearing regarding the three statements given by the petitioner, i.e., the petitioner's statement which was given at the scene of the crime on December 20, 2008, the petitioner's voluntary comments which he made while he was being transported to the regional jail, and the petitioner's statement taken at the regional jail on December 21, 2008. During the suppression hearing, the arresting officer stated that the petitioner did not appear to be intoxicated and that he gave a knowing and voluntary

intentional waiver of his right to remain silent. The circuit court found all three of the statements to be admissible at the petitioner's trial.

On October 9, 2009, both parties appeared for a pre-trial hearing. At that time, the State provided the petitioner with additional discovery materials. The petitioner objected to the late disclosure of these materials and filed a motion to exclude the evidence. The circuit court set a future date for a hearing on the petitioner's motion, but proceeded with the previously scheduled jury selection. The jury was empaneled, but was not sworn in.

Thereafter, on October 22, 2009, the petitioner argued his motion to exclude the evidence and also asserted his right to trial during the same term of court since the jury had already been empaneled. The State responded to the motion by expressing that the delay in providing the discovery materials had occurred because of the failure of the forensic laboratory in Charleston to complete its work in a timely fashion. Despite the petitioner's objection, the circuit court continued the trial until February 16, 2010, on its own initiative. The circuit court also set November 23, 2009, as the new date for the State to provide the remaining discovery materials to the petitioner and made it clear that anything not produced by that time period would be inadmissable.

On February 16, 2010, the circuit court empaneled a new jury and proceeded to trial. On February 18, 2010, the jury returned a verdict of guilty to the charge of murder in the first degree. The circuit court then began the bifurcated mercy phase of the trial. The jury returned a finding of no mercy that same day. On April 7, 2010, the petitioner filed several post-trial motions. The petitioner's motions were denied and the circuit court scheduled a sentencing hearing for May 4, 2010, wherein the petitioner was formally sentenced to life in the penitentiary without mercy. The circuit court entered an order reflecting the petitioner's sentence on May 10, 2010. Thereafter, the circuit court entered an order extending the time frame for the filing of an appeal to November 1, 2010. This appeal followed.

## II.

### STANDARD OF REVIEW

■ The petitioner sets forth ten assignments of alleged error in the trial proceedings that he contends should cause this Court to set aside the jury's verdict. This Court has held that: "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). This Court has also indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. Syllabus Point 1, *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997). The more specific standards of review applicable to each assignment of error will be incorporated into the discussion below.

## III.

### DISCUSSION

The petitioner presents ten assignments of error. Each alleged error will be discussed below.

#### A. One Term Rule

The petitioner asserts that the circuit court violated his statutory right to be tried within the same term of court as his indictment. He asserts that there was no "good cause" to continue his trial until the next term of court. Despite his objection, the circuit court continued the trial because the State had failed to provide discovery materials in a timely fashion. The petitioner maintains that the circuit court should have excluded the evidence and proceeded with the trial as scheduled because the jury had been empaneled.

Conversely, the State says it made numerous good-faith efforts to produce the forensic test results in a timely fashion, but was unable to do so because of the failure of the forensic laboratory in Charleston to complete its work in a timely fashion. The State maintains that these facts constituted good

cause to continue the petitioner's trial until the next term of court and that the delay was out of the prosecution's control.

■ West Virginia Code § 62–3–1, in part, provides: "When an indictment is found in any county, against a person for a felony or misdemeanor, the accused, if in custody, or if he appear in discharge of his recognizance, or voluntarily, shall, unless good cause be shown for a continuance, be tried at the same term." This Court has explained, however, that the one-term rule does not embody a right of constitutional dimension, but "provides a personal right to the defendant to be tried more expeditiously than the Constitution requires." *State ex rel. Workman v. Fury*, 168 W.Va. 218, 221, 283 S.E.2d 851, 853 (1981).[2] Thus, this Court has recognized that when good cause has been shown, a trial court may, upon its own motion or upon motion of one or more parties, continue a criminal trial beyond the term of indictment. In Syllabus Point 2 of *State ex rel. Shorter v. Hey*, 170 W.Va. 249, 294 S.E.2d 51 (1981), this Court explained that:

> The determination of what is good cause, pursuant to W.Va.Code, 62–3–1, for a continuance of a trial beyond the term of indictment is in the sound discretion of the trial court, and when good cause is determined a trial court may, pursuant to W.Va. Code, 62–3–1, grant a continuance of a trial beyond the term of indictment at the request of either the prosecutor or defense, or upon the court's own motion.

Moreover, in Syllabus Point 4 of *Hey*, the Court held:

> Where the trial court is of the opinion that the state has deliberately or oppres-

sively sought to delay a trial beyond the term of indictment and such delay has resulted in substantial prejudice to the accused, the trial court may, pursuant to W.Va.Code § 62–3–1, finding that no good cause was shown to continue the trial, dismiss the indictment with prejudice, and in so doing the trial court should exercise extreme caution and should dismiss an indictment pursuant to W.Va.Code § 62–3–1, only in furtherance of the prompt administration of justice.

■ Upon reviewing the entire record below, there is nothing to indicate that the State intentionally or oppressively sought to delay the trial nor is there a showing that the delay caused any substantial prejudice to the petitioner. The prosecuting attorney explained to the circuit court that certain items of discovery had not been provided to the petitioner in spite of the prosecutor's repeated requests to the State Police to provide those materials. Nonetheless, very early in the case, the State did provide a substantial amount of evidence to the petitioner described by the State as "the guts of its case." The petitioner was also provided copies of his own statements, all of which had already been the subject of a suppression hearing and were ruled admissible at his trial. Likewise, the statements of Brian Joseph, Jason Dehainant, Charles McCartney, and Steven Mealey were provided to the petitioner. He also had the testimony at the preliminary hearing by the county coroner as to the cause of death and had the testimony of Trooper Morgan and Trooper Brewer regarding statements made by the petitioner. He was also given pictures on a

---

**2.** This Court has distinguished between W.Va. Code § 62–3–1, which is applicable to the case at hand and known as the one-term rule, with that of W.Va.Code § 62–3–21, commonly known as the three-term rule. This Court has held:

> Whereas W.Va.Code 62–3–1, provides a defendant with a statutory right to a trial in the term of his indictment, it is W.Va.Code 62–3–21, rather than W.Va.Code 62–3–1, which is the legislative adoption or declaration of what ordinarily constitutes a speedy trial within the meaning of U.S. Const., amend. VI, and W.Va. Const., art. III, § 14.

Syllabus Point 1, *State ex rel. Shorter v. Hey*, 170 W.Va. 249, 294 S.E.2d 51 (1981). In Syllabus

Point 4 of *Good v. Handlan*, 176 W.Va. 145, 342 S.E.2d 111 (1986), this Court stated:

> The possible reasons justifying good cause for a continuance under W.Va.Code, 62–3–1, are broader than the causes listed in W.Va. Code, 62–3–21, as valid reasons for not counting a particular term. As a consequence, the causes justifying continuances listed in the three-term rule, W.Va.Code, 62–3–21, may be applied in a one-term rule situation, but the general good cause standard in W.Va.Code, 62–3–1, may not be applied in a W.Va.Code, 62–3–21 situation.

CD that showed the victim and the crime scene.

After considering the entirety of the situation, the circuit court, on its own initiative, found that there was good cause to continue the case from late October until the following February. The circuit court noted that the petitioner had a right to all of the scientific reports and other evidence that had not yet been provided to him during discovery. The circuit court further explained that the case was not ready for trial and that a continuance would allow the petitioner and his counsel additional time to fully review all of the evidence against him and to obtain any necessary witnesses to respond to the discovery materials provided by the prosecution. As such, the circuit court's continuance of the petitioner's trial was not error as it was done with good cause and did not result in a substantial prejudice to the petitioner.

### B. Petitioner's Second Statement/Prompt Presentment Rule

■ The petitioner contends that the circuit court erred by ruling that his statement taken at the regional jail prior to his arraignment was admissible. The petitioner maintains that pursuant to Rule 5(a) of the Rules of Criminal Procedure[3] and W.Va.Code § 62–1–5,[4] a person who has been arrested has the right to be presented without unreasonable or unnecessary delay before a magistrate. The petitioner maintains that the State took advantage of his limited intellect, his inability to read, and his unfamiliarity with the law, in order to gather additional inculpatory evidence against the petitioner before he could be advised of his rights by the circuit court.

Conversely, the State maintains that there was no violation of the prompt presentment rule and that there was no indication that the police officer was trying to overcome the petitioner's will in taking his statement. The State points out that the arraignment was

scheduled by the magistrate's office for noon and the officer took the petitioner's statement at 10:15 a.m. The State contends that there was no delay in presenting the petitioner to the magistrate in order to obtain a confession and that the police had already obtained a confession the prior day, and that the second statement was consistent with his first confession.

In this case, the petitioner was arrested at approximately 7:00 p.m. on December 20, 2008. Soon thereafter, while still at the scene of the crime, the petitioner waived his *Miranda* rights and provided a voluntary statement to investigating officers claiming that he accidentally shot his girlfriend in the head with a pistol and killed her. He was then transported to the regional jail where he was scheduled for arraignment before a magistrate the following day at noon. Prior to his arraignment, the investigating officer took an additional voluntary statement from the petitioner. The officer testified that his reason for obtaining the second statement was that the petitioner may have been upset when he gave his first statement and that he wanted to give the petitioner a chance to "calm down" and correct any potential errors from the previous night's statement. Following a hearing on the admissibility of the evidence, the circuit court determined that both statements were voluntary and admissible and did not constitute a prompt presentment violation.

This Court has held that: " ' " 'The delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissable] where it appears that the primary purpose of the delay was to obtain a confession from the defendant.' Syllabus Point 6, *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982), as amended." Syllabus Point 1, *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984).' Syl. Pt. 8, *State*

---

3. Rule 5(a) states, in part: "An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before a magistrate within the county where the arrest is made."

4. W.Va.Code § 62–1–5(a)(1), provides, in part: "An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence or as otherwise authorized by law, shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made."

*v. Milburn,* 204 W.Va. 203, 511 S.E.2d 828 (1998)." Syllabus Point 6, *State v. Johnson,* 219 W.Va. 697, 639 S.E.2d 789 (2006). On numerous occasions, this Court has found that delays in taking an accused to a magistrate were not violations of the prompt presentment rule. In *State v. DeWeese,* 213 W.Va. 339, 344 n. 8, 582 S.E.2d 786, 791 n. 8 (2003), this Court stated:

To be clear, merely detaining a defendant in jail under an arrest warrant for fifteen hours before taking him/her to a magistrate will not trigger a sanctionable violation of the prompt presentment rule. A sanctionable violation occurs if the purpose for detaining the defendant is to conduct an interrogation to obtain an incriminating statement from the defendant about his or her involvement in the crime for which he or she was arrested. *See State v. Milburn,* 204 W.Va. 203, 511 S.E.2d 828 (1998) (holding that delay in taking defendant to magistrate did not violate the prompt presentment rule because the delay was for the purpose of questioning the defendant about a crime for which he was not arrested).

*See also Johnson, supra;* and *State v. Plantz,* 155 W.Va. 24, 180 S.E.2d 614 (1971).

In this case, as previously discussed, after being held for a brief and reasonable amount of time as officers secured the scene of the crime, the petitioner made a voluntary statement *after* he was given his *Miranda* warnings. The petitioner explained that he pointed a gun at the victim's head and accidentally pulled the trigger and killed her. Then, due to the fact that the petitioner had been drinking the prior evening, the investigating officer approached the petitioner again the next morning to allow him to provide another statement to make sure that his prior statement was voluntary. The petitioner again waived his *Miranda* rights and provided a second statement that was nearly identical to his prior statement.

■ This Court has held that a delay in presenting a defendant to a magistrate *after* he has confessed does not violate the prompt presentment rule because the purpose of the rule is to avoid prolonged interrogation in order to coerce a confession. In Syllabus Point 2 of *State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989), this Court held:

" 'Ordinarily the delay in taking an accused who is under arrest to a magistrate after a confession has been obtained from him does not vitiate the confession under our prompt presentment rule.' Syllabus Point 4, *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986)." Syllabus Point 8, *State v. Worley,* 179 W.Va. 403, 369 S.E.2d 706, *cert. denied,* 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988).

Likewise, in *State v. Whitt,* 184 W.Va. 340, 345, 400 S.E.2d 584, 589 (1990), this Court explained:

Under our prompt presentment rules, W.Va.Code, 62–1–5, and Rule 5(a) of the Rules of Criminal Procedure, we have recognized that the delay in transporting a defendant to police headquarters and the time consumed in routine processing is not critical for prompt presentment purposes. *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982). In several other cases, we have found that a delay in presenting the defendant to a magistrate after he has confessed does not violate our prompt presentment statute either, because the purpose of the statute is to avoid prolonged interrogation in order to coerce a confession. *State v. Hutcheson,* 177 W.Va. 391, 352 S.E.2d 143 (1986); *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986).

Based on all of the above, it is clear that any delay that may have occurred in bringing the petitioner before a magistrate was not for the purpose of obtaining a confession from him. The petitioner provided two voluntary statements after waiving his *Miranda* rights and was not the subject of prolonged interrogation in order to coerce either of those confessions. As such, there was no abuse of discretion on the part of the circuit court in admitting the petitioner's second statement to the investigating officer into evidence at his trial.

### C. Admission of Murder Weapon/Chain of Custody

■ The petitioner contends that the murder weapon should not have been admitted

into evidence because the State did not provide information regarding the chain of custody of the weapon. The petitioner notes that the rules governing chain of custody are designed to ensure that evidence introduced at trial is substantially similar in condition to the same evidence as discovered during the pretrial investigation. The petitioner maintains that the State failed to call relevant witnesses, including the custodian of the State Police evidence locker, to testify regarding the chain of custody and therefore, the gun should not have been admitted into evidence.

In response, the State argues that whether a sufficient chain of custody has been shown to permit admission of physical evidence is an issue for the trial court's discretion. The State maintains that to allow the admission of physical evidence into a criminal trial, the circuit court, in its discretion, must be satisfied that the evidence presented is genuine and, in reasonable probability, has not been tampered with. The State argues that there was no evidence that the firearm in question was not genuine or had been tampered with, and thus, the circuit court did not abuse its discretion in admitting the weapon.

 This Court has plainly established that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syllabus Point 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). *Accord* Syllabus Point 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983) (" 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, [171] W.Va. [639] [643] 301 S.E.2d 596, 599 (1983)."). Moreover, "[t]he preliminary issue of whether a sufficient chain of custody has been shown to permit the admission of physical evidence is for the trial court to resolve. Absent abuse of discretion, that decision will not be disturbed on appeal." Syllabus Point 2, *State v. Davis*, 164 W.Va. 783, 266 S.E.2d 909 (1980).

In this case, the petitioner does not allege or point to any evidence in the record to show that the weapon introduced into evidence was not genuine or had been tampered with in any manner. At trial, the police firearms examiner who inspected the gun, and through whom the prosecution introduced the gun into evidence at the petitioner's trial, identified the gun as the weapon that his office had received and tested. He identified his initials and the initials of the police officers as showing the receipt of the gun at the police firearms lab. He then testified that the gun worked properly and that based upon laboratory testing of the weapon, it did not fire accidentally.[5] The circuit court's ruling admitting the gun into evidence was not an abuse of discretion.

### D. Testimony Regarding Cause of Death

 The petitioner argues that the circuit court erred by admitting the testimony of the county coroner as the *only* evidence to establish that the victim's cause of death was a gunshot to the head. The petitioner contends that although the medical examiner performed an autopsy of the victim, the State failed to introduce any evidence relating to the autopsy and its results. Moreover, he argues that the coroner was not qualified to give an opinion as to the victim's cause of death, was not qualified as an expert witness, and was not a physician or other qualified person. Therefore, the petitioner asserts that his opinion should have been excluded as to the cause of death. The State, however, contends that the coroner's testimony was sufficient to establish cause of death.

At the outset, it is noted that the petitioner incorrectly states in his brief that "the only evidence introduced by the State as to the cause of death was the testimony of Patrick Tomey, who testified as the County Coroner for Lewis County." This factual assertion is simply untrue. The county coroner did testify regarding the victim's cause of death as a "gunshot to the head" because he was at the scene of the crime and prepared the victim's body for transport to the State Medical Examiner's office for autopsy. In addition, however, the petitioner fails to mention that

---

5. The expert testified that it took four pounds of pressure to fire it with the hammer cocked and eleven and one-half pounds of pressure to fire it if the hammer was not cocked.

the State also presented the petitioner's own statements to the investigating officers wherein he explained that he had shot the victim at point blank in the head with his pistol and killed her. Furthermore, the State introduced testimony from the petitioner's neighbors who testified that the petitioner told them that he shot the victim in the head resulting in her death. Nothing in the record or the briefs herein indicates that the victim died from anything other than the gunshot to her head fired by the petitioner. As the circuit court explained:

> Well, the cause of death is one of the things that the State has to prove.... Then if the jury—it's a jury question, as to whether or not they have proved the cause of death. There's testimony before the jury that based on the statement alone of the [petitioner], that he went in there and the gun went off and hit her in the head and it killed her. Does it have to go beyond that?.... Unless there is an issue as to how else she may have died.

The circuit court further stated that the State proved its burden surrounding the victim's cause of death, but told the petitioner's counsel: "If you want to prove she died some other way, you go right ahead." The petitioner, however, did not present any evidence to dispute the victim's cause of death as anything other than the petitioner shooting her in the head.

■■■ As discussed, this Court has held, " ' "[t]he West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary . . . rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary . . . rulings of the circuit court under an abuse of discretion standard." Syllabus Point 1, in part, *McDougal v. McCammon,* 193 W.Va. 229, 455 S.E.2d 788 (1995).' Syllabus Point 9, *Smith v. First Community Bancshares, Inc.,* 212 W.Va. 809, 575 S.E.2d 419 (2002)." Syllabus Point 2, *State v. Harris,* 216 W.Va. 237, 605 S.E.2d 809 (2004). In light of all of the above, the circuit court did not abuse its discretion in allowing the coroner's testimony and ruling that there was sufficient evidence

to demonstrate to a jury that the victim's cause of death was a gunshot to her head fired by the petitioner.

### E. Closing Arguments During Mercy Phase

■■■ The petitioner next contends that he was denied a fair trial because he was not afforded the opportunity to present a closing argument during the mercy phase following his conviction. The petitioner notes that this Court explained in *State v. McLaughlin,* 226 W.Va. 229, 700 S.E.2d 289 (2010), that the proper procedure to be followed in the bifurcated penalty phase of a murder trial is to allow a defendant to "have the last argument to the jury before it would make the mercy determination." He also argues that this Court recognized in *State v. Webster,* 218 W.Va. 173, 624 S.E.2d 520 (2005), that a defendant has the right to present a closing argument and the failure of the trial court to allow such opportunity constitutes reversible error. The petitioner contends that since he was never offered the opportunity to present closing arguments, that he did not waive such arguments and was deprived of his right to a fair trial.

In contrast, the State argues that nothing in the record indicates that the petitioner ever sought leave to present a closing argument to the jury at the end of the mercy phase. The State contends that the petitioner may have actually avoided closing argument so as not to "open the door" to closing argument by the State. The State also points out that the only evidence presented at the mercy phase was the testimony of the petitioner, leaving the defense little to argue to the jury.

The petitioner's reliance on *McLaughlin* and *Webster* is misplaced. In *McLaughlin,* this Court answered four certified questions concerning the burden of persuasion in the penalty phase, whether there must be a unanimous verdict in a bifurcated mercy phase, whether the same jury must determine both the guilt and the issue of mercy, and whether the prosecution is limited in the mercy stage of a bifurcated trial to present certain evidence. This Court explained that the proper procedure to be followed in the

bifurcated penalty phase of a murder trial is to allow a defendant to "have the last argument to the jury before it would make the mercy determination." *See McLaughlin,* 226 W.Va. at 240, 700 S.E.2d at 300. This, however, is not relevant to the case at hand. The petitioner in this case was not denied an opportunity for closing argument during the bifurcated mercy phase. The petitioner did not seek to make a closing argument.

In *Webster,* the appellant was denied the right to make a closing argument. In that case, after the defense rested, the circuit court immediately began to issue a verdict. *Defense counsel objected and asked for a mistrial stating,* "I haven't had a closing argument or an opportunity to discuss any of this. We haven't had an opportunity to present any findings of fact. And you're making a decision on this, Your Honor, I find that you have not given her a fair trial here, Your Honor." The circuit court noted the objection and replied, "I've heard enough and don't want to hear any closing argument, very candidly, and it's my option." 218 W.Va. at 176, 624 S.E.2d at 523. Based upon those facts, this Court found that the circuit court clearly erred by refusing to allow the appellant's counsel to make a closing argument. Nonetheless, the facts of *Webster* are not remotely similar to the petitioner's case herein. As previously stated, the petitioner's counsel did not ask to argue to the jury at the close of the mercy phase of the petitioner's trial. The mercy phase was brief and consisted solely of the petitioner's testimony. The petitioner's counsel could have sought an argument, but chose not to do so. It is impossible for this Court to know the reasoning behind the petitioner's counsel's decision not to seek a closing argument. In any event, the petitioner's contention that he was "not permitted the chance to argue [mercy]" is not supported by the record and without merit.

### F. Jury Instruction

■ The petitioner states that the circuit court erred in giving the State's jury instruction number six because it did not contain all relevant elements of first degree murder. He contends that the inadequacy of the instruction was established during jury deliber-

ations when the jury submitted a question about the definitions of the offenses. Conversely, the State maintains that there was no error in giving instruction number six to the jury.

■ This Court has established that the following standards of review are applicable to jury instructions:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syllabus Point 4, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Further, "the question of whether a jury was properly instructed is a question of law, and the review is *de novo.*" Syllabus Point 1, *State v. Hinkle,* 200 W.Va. 280, 489 S.E.2d 257 (1996).

In this case, the instruction in question provided:

The jury is instructed that Murder in the First Degree consists of an intentional, deliberate and premeditated killing, which means the killing is done after a period of time for prior consideration. The duration of the period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies, as the minds and temperaments of people differ, and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of the intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is suf-

ficient to support a conviction for First Degree Murder.

This instruction was taken directly from the opinion in *State v. Guthrie*, 194 W.Va. 657, 676–77, 461 S.E.2d 163, 182–83, wherein this Court approved as a proper instruction the following:

The jury is instructed that murder in the first degree consists of an intentional, deliberate and premeditated killing which means that the killing is done after a period of time for prior consideration. The duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ, and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder.

(Citations omitted).

As demonstrated, the instruction given at the petitioner's trial is nearly identical to the one approved by this Court in *Guthrie*. In fact, each and every word is the same with the exception of the addition of one comma included for grammatical reasons and the capitalization of the words "First," "Degree," and "Murder." This instruction was proper and the mere fact that the jury asked a question about the instructions does not invalidate that instruction.

In this case, the jury foreperson asked: "We would like to have [the] definition[s], written definition[s] of the offenses as charged, Murder First, Murder Two, Voluntary Manslaughter, broken down so that we can compare and contrast, perhaps, to make sure we cover all bases." Upon being asked the question, the circuit court responded to this inquiry by re-reading the instructions and also providing the jury a copy of the instructions. The jury's question appears to show the jurors due diligence in determining their verdict beyond a reasonable doubt based on the law and evidence presented. The record supports the finding that the instruction was a correct statement of law

and it was supported by the evidence. Moreover, it is clear that the jury instructions, when "reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law." *Guthrie, supra*. As such, the petitioner's argument is without merit.

## G. Prosecutorial Comment During Closing Argument

The petitioner argues that the circuit court erred by not taking any action regarding the prosecutor's improper remark to the jury during closing argument. The prosecutor stated: "nothing can bring Vickie back, it's true, but letting a murderer go invites a repeat of the same crime." The petitioner admits that he did not object to the statement at the time it was made by the prosecutor; however, he did object after the prosecutor finished his closing argument and asked the circuit court to instruct the jury not to consider the remark. The circuit court noted that there had not been a contemporaneous objection and stated: "I think that it would be worse to say something to them about it now, just let it go." The petitioner maintains that the circuit court's failure to give a limiting instruction constituted error.

Conversely, the State argues that the prosecutor is allowed to comment on the prevalence of crime, the necessity of law enforcement as a deterrent, and the evil results that may befall the community when a jury fails to do its duty. The State also maintains that even if the remark was improper, that it did not warrant the granting of a mistrial or a new trial because the remark did not prejudice the petitioner or result in manifest injustice.

In Syllabus Point 6 of *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995), this Court held:

Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the

strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Moreover, Syllabus Point 5 of *Sugg* clarified that not every improper prosecutorial remark will result in reversal of a conviction: "A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Likewise, in *State v. Graham*, 208 W.Va. 463, 468, 541 S.E.2d 341, 346 (2000), this Court addressed the principles utilized to evaluate prosecutorial comments and explained as follows:

> In reviewing allegedly improper comments made by a prosecutor during closing argument, we are mindful that "[c]ounsel necessarily have great latitude in the argument of a case," *State v. Clifford*, 58 W.Va. 681, 687, 52 S.E. 864, 866 (1906) (citation omitted), and that "[u]ndue restriction should not be placed on a prosecuting attorney in his argument to the jury." *State v. Davis*, 139 W.Va. 645, 653, 81 S.E.2d 95, 101 (1954), overruled, in part, on other grounds, *State v. Bragg*, 140 W.Va. 585, 87 S.E.2d 689 (1955). Accordingly, "[t]he discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syllabus Point 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927).

208 W.Va. at 468, 541 S.E.2d at 346; *see also State ex rel. Edgell v. Painter*, 206 W.Va. 168, 522 S.E.2d 636 (1999); *State v. Smith*, 190 W.Va. 374, 438 S.E.2d 554 (1993); *State v. Hobbs*, 178 W.Va. 128, 358 S.E.2d 212 (1987); *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979).

This Court in *Guthrie, supra,* further explained:

> Prosecutorial misconduct does not always warrant the granting of a mistrial or a new trial. The rule in West Virginia since time immemorial has been that a conviction will not be set aside because of improper remarks and conduct of the prosecution in the presence of a jury which do not clearly prejudice a defendant or result in manifest injustice. *State v. Beckett*, 172 W.Va. 817, 310 S.E.2d 883 (1983); *State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982). Similarly, the United States Supreme Court has acknowledged that given "the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." *U.S. v. Hasting*, 461 U.S. at 508–09, 103 S.Ct. at 1980, 76 L.Ed.2d at 106. Thus, the Supreme Court has held that an appellate court should not exercise its "[s]upervisory power to reverse a conviction ... when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error." *Hasting*, 461 U.S. at 506, 103 S.Ct. at 1979, 76 L.Ed.2d at 104.

*Guthrie*, 194 W.Va. at 684, 461 S.E.2d at 190. With regard to whether prejudice occurred regarding questionable comments by a prosecutor, this Court in *Guthrie* instructed:

> In determining prejudice, we consider the scope of the objectionable comments and their relationship to the entire proceedings, the ameliorative effect of any curative instruction given or that could have been given but was not asked for, and the strength of the evidence supporting the defendant's conviction. *See McDougal v. McCammon, supra.* As the United States Supreme Court explained "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments [or conduct] standing alone, for the statements or conduct must be viewed in context[.]" *U.S. v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1, 9–10, on remand, 758 F.2d 514, on reconsideration, 767 F.2d 737 (1985) (finding harmless error where the prosecutor made an improper statement that the defendant was guilty and urged the jury to "do its job").

*Guthrie*, 194 W.Va. at 685, 461 S.E.2d at 191.

After reviewing the record in its entirety, it is clear that the challenged remark

was an isolated comment, was limited in nature, was not made to divert the jury into irrelevant or improper matters, and was not inappropriate in the context of the charge and the evidence presented therein. The circuit court considered the petitioner's request for a limiting instruction, considered the fact that the petitioner's counsel had not objected at the time the remark was actually made, and thereafter made a reasoned decision that highlighting the isolated comment could impact the jury in a negative manner. The evidence in this case was overwhelming. The petitioner shot his girlfriend in the head and killed her. He admitted that he shot her, but claimed that while he and the victim were arguing, that he grabbed his gun from another room of his home, pointed it at her head, and accidentally pulled the trigger. The evidence also showed that the petitioner was arguing with the victim prior to the murder and that he suspected that she had been having a relationship with another man. There is no evidence that this isolated comment prejudiced the petitioner or resulted in manifest injustice. The relevant standard is therefore not met and the circuit court did not err in declining to give a corrective instruction which would have only served to draw further attention to the challenged remark.

### H. Alleged Defective Indictment

■ The petitioner states that the circuit court should have dismissed the charges against him or granted a verdict of acquittal because the indictment against him failed to properly identify the victim. The indictment misspelled the victim's name as "Vicki Page" instead of "Vickie Page." The petitioner contends that the State did not move to amend the indictment, nor did it seek re-indictment with the proper name of the victim.

The State argues that the fact that the indictment referenced the victim's first name as "Vicki" rather than the proper spelling of "Vickie" is insufficient to render the indictment defective. The State maintains that if a person of ordinary intelligence can determine with certainty what was meant by the reference to "Vicki Paige" as the victim, the mere misspelling of her first name by one letter does not render the indictment invalid.

■ In Syllabus Point 1 of *State v. Rudy*, 98 W.Va. 444, 127 S.E. 190 (1925), this Court held that: "The misspelling of words or typographical errors are not fatal to an indictment, where they do not affect the sense, and the meaning of such words can be determined with certainty by a person of ordinary intelligence." More recently, in *State v. Corra*, 223 W.Va. 573, 580–581, 678 S.E.2d 306, 313–314 (2009), this Court discussed issues raised regarding an indictment and explained that not every variation between an indictment and proof at trial creates reversible error. The Court explained:

On the one hand, many cases have recognized several types of variance that do not prejudice the defendant:

(1) When the variance or amendment of the indictment is one of form only. *See, e.g.*, Syllabus Point 3, *State v. Adams*, [193 W.Va. 277, 456 S.E.2d 4 (1995)] (indictment could be changed to correct name of owner of stolen goods).

(2) When the proof at trial merely narrowed the basis for conviction and did not broaden the charges beyond what was in the indictment. *See, e.g.*, *United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (conviction upheld when indictment alleged two methods by which defendant defrauded his insurer, but proof at trial showed only one of those two methods).

(3) Where the date of the crime in the indictment and the date proven that the crime actually occurred differs. *See, e.g.*, Syllabus Point 4, *State v. Chaffin*, 156 W.Va. 264, 192 S.E.2d 728 (1972) ("A variance in the pleading and the proof with regard to the time of the commission of a crime does not constitute prejudicial error where time is not of the essence of the crime charged").

(4) Typographical errors that do not affect the substance of the allegations in the indictment. *See, e.g.*, *United States v. Morrow*, 925 F.2d 779 (4th Cir.1991) (omission of the first digit in a seven digit serial number of the firearm set forth in the indictment did not result in a substantial amendment).

(5) When the proof at trial does not add anything new to the charges. *See, e.g.*,

*United States v. Redd,* 161 F.3d 793 (4th Cir.1998) (indictment stating that defendant used a black revolver during bank robbery was not constructively amended when proof offered at trial indicated that he used silver revolver).

223 W.Va. at 580–581, 678 S.E.2d at 313–314. Moreover, in *State v. Johnson,* 197 W.Va. 575, 581–582, 476 S.E.2d 522, 528–529 (1996), this Court explained that "[w]hether the difference between the indictment and proof adduced at trial is merely a variance or whether the difference is an actual or a constructive amendment of the indictment will have to be determined on a case-by-case basis."

While an indictment was returned naming "Vicki Page" as the victim instead of the correct spelling of "Vickie Page," this does not rise to a level of reversible error.[6] This was a typographical error that did not affect the substance of the allegations in the indictment and there is no evidence that the spelling of "Vickie" as "Vicki" had any impact whatsoever on the petitioner's case. Moreover, there was no confusion regarding the identity of the victim as she was clearly identified by the testimonial evidence adduced at trial. In fact, the petitioner did not introduce any evidence to contradict the identity of the decedent as being someone other than the person named in the indictment. Based upon all of the evidence of record, the meaning of "Vicki Page" could have easily been determined with certainty by a juror of ordinary intelligence to be that of "Vickie Page."

### I. Sufficiency of the Evidence

■ The petitioner states that there was insufficient evidence to convict him of first degree murder. He argues that the State's witnesses established his own theory of diminished capacity due to his intoxication and the heat of passion. He states that given all of the evidence against him, that the State proved no more than a lesser included offense. Conversely, the State argues that the there was sufficient evidence to support the petitioner's conviction of first degree murder.

This Court has explained that the law provides that a jury's verdict should be respected and affirmed unless there is no evidence upon which verdicts of guilty beyond a reasonable doubt could be based. *See* Syllabus Point 2, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Moreover, when a criminal defendant challenges the sufficiency of the evidence, all evidence must be viewed from the prosecutor's "coign of vantage." *See* Syllabus Point 2, *State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996).

■ In Syllabus Point 1 of *Guthrie,* we set forth our standard of review for cases making a challenge to the sufficiency of the evidence. This standard is as follows:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Moreover, in Syllabus Point 3 of *Guthrie,* this Court held:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

---

**6.** In his handwritten statement to the investigating officer on the night of the murder, the petitioner spelled the victim's name as "Vichy" instead of "Vickie."

Reviewing the record before this Court "in the light most favorable to the prosecution," it is abundantly clear that "any rational trier of fact could have found the essential elements of the crime[s] proved beyond a reasonable doubt." Syllabus Point 1, *Guthrie*. In that regard, the State presented evidence from which the jury could have concluded that the petitioner committed first degree murder. The State demonstrated that the petitioner physically abused the victim and then escalated this violence by using a gun to threaten and then kill her. The State then presented evidence that the petitioner shot the victim in the head at close range with a gun that was shown by experts to have been in perfect working order. Moreover, based upon the evidence presented, a jury could have concluded that the petitioner's actions did not result from grabbing the gun in a fit of blind rage. Instead, a jury could have concluded that he deliberately left the bedroom, grabbed the loaded gun from another room, returned and held it to the victim's head and threatened her with it. Then, jurors could have concluded, based upon the petitioner's own statements, that he pulled the trigger and killed the victim. Jurors could have also concluded that the petitioner's motive was malicious retribution for the victim's supposed infidelity with Mr. Joseph and her refusal to admit it. In this case, it is undeniable that the jury was presented with sufficient evidence to support its finding that the petitioner was guilty of the underlying crime beyond a reasonable doubt. Therefore, this Court finds no error regarding this issue.[7]

## IV.

### CONCLUSION

For the reasons stated above, we affirm the decision of the Circuit Court of Lewis County entered on May 10, 2010.

Affirmed.

---

[7] The petitioner also argues that based upon the numerous alleged errors discussed during his petition for appeal to this Court, that his conviction and sentence should be reversed. Because we have found no error in this case, we decline to address the petitioner's claim of cumulative error.